UNITED STATES

v.

Dwayne Edward WEST, 543 86 1017, Fireman (E–3), U.S. Navy.

NMCM 83 3425.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 10 June 1983.

Decided 27 Oct. 1983.

LCDR Jeanne Carroll, JAGC, USN, Appellate Defense Counsel.

MAJ Joseph M. Poirier, USMC, Appellate Defense Counsel.

LCDR R. Clayton Seaman, Jr., JAGC, USN, Appellate Government Counsel.

Before ABERNATHY, MITCHELL and BARR, JJ.

BARR, Judge:

Appellant, citing *United States v. Shelwood,* 15 M.J. 222 (C.M.A.1983) as authority, contends now, as he has at every stage of the trial and review process, that Prosecution Exhibit 3, a NAVPERS 1070/607, which records the imposition of a nonjudicial punishment received on 25 April 1983, was inadmissible as evidence offered in aggravation pursuant to Paragraph 75b(2), *Manual for Courts-Martial, 1969 (Rev.)* (MCM). Paragraph 75b(2), MCM authorizes, where otherwise relevant and admissible under the Military Rules of Evidence (Mil.R.Evid.), the presentation to, and consideration by, the sentencing authority of personnel records of an accused "made or

maintained in accordance with departmental regulations which reflect the past conduct and performance of the accused." The argument of appellant is that because he was not accorded the rights granted under Article 1110, U.S. Navy Regulations 1973,[1] the exhibit in question did not meet the mandate of the aforementioned MCM provision.

Appellant's belief in the merit of his assertion obviously stems from two statements in *Shelwood*, wherein the Court of Military Appeals summarized, and subsequently rejected, the conclusion of the Judge Advocate General of the Navy[2] as to the applicability of Article 1110 to Paragraph 1000.3c(2), of the Marine Corps Individual Records Administration Manual (IRAM):

"... (T)he Acting Judge Advocate General concluded that the '*punitive* unfavorable matter' listed in paragraph 1000.-3c(2), IRAM, was not '*adverse matter*' within the meaning of Article 1110."[3] (Emphasis added)

*Shelwood, supra*, at 225.

"... (T)he language of Article 1110 is clear and unambiguous, and admits of no basis for changing its plain meaning."

*Shelwood, supra*, at 226.

For the reasons hereinafter stated, we disagree with appellant's overly broad interpretation of the quoted passages from *Shelwood*, and, thus, his application of that case to the facts at bar.

■ We are of the opinion, and so hold, that properly prepared service record entries recording the results of a nonjudicial punishment do not come within the purview of Article 1110 and, thus, if otherwise admissible, can be introduced as evidence under Paragraph 75*b*(2), MCM. Though not addressed as an issue in this case, we conclude that the same rationale and resolution which applies to records of nonjudicial punishment controls, with equal force and logic, the question of the application of Article 1110 to service record entries, proffered for admissibility under Paragraph 75*b*(3), MCM, which evidence prior convictions by military courts-martial. Furthermore, we expand our analysis of the central issue assigned to conclude that service record entries which serve the legitimate administrative recordkeeping function of recording an allegation of reported unauthorized absence[4] do not require, as a condition precedent to their admissibility as documents of proof on the merits of that allegation at a criminal proceeding, evidence of compliance with Article 1110.

We unhesitatingly reach these conclusions based on an analysis of *Shelwood*, and its progeny, a consideration of the aforementioned opinion of the Judge Advocate General, a reasoned application of the concept of procedural due process, and a good measure of common sense.

■ However, even were we to adopt the most expansive meaning of "adverse matter" as that term is employed within Article 1110 and, as a result, resolve that the service record entries above described do fall within that meaning, we have no difficulty in finding that the procedures attendant to the use and admissibility of each such entry, which provide equivalent, and, in fact, far greater, safeguards than those embraced within Article 1110, conform to the requirements of that Article. As such, the "made or maintained" requirement of Paragraph

---

1. "Adverse matter shall not be placed in the record of a person in the naval service without his knowledge.... [S]uch matters shall be first referred to the person reported upon for such statement as he may choose to make. If the person reported upon does not desire to make a statement, he shall so state in writing."

2. The complete text of the opinion is set forth in *United States v. Shelwood*, 10 M.J. 755 (N.C.M.R.1981), at 760–763.

3. Based on a consideration of the items listed in Paragraph 1000.3c(2), IRAM, it appears that the term "punitive" was inartfully chosen to be synonymous with "adverse", for clearly only items a, c, and d of that paragraph can arguably be construed as "punitive" in the sense of issuing from a disciplinary or judicial proceeding.

4. In the naval service we refer to page 13 entries and the NAVPERS 1070/606.

75b(2), MCM, would not be a bar to admissibility on this ground. We so conclude because we view the primordial purpose underlying Article 1110 to be to afford a service member a contemplated degree of due process, expressed as a concept of law, rather than the mere creation of a procedural "paper-tiger".

The focus of our inquiry is obviously directed toward the central question of whether the decisions of *Shelwood,* as well as the subsequent pronouncement in *United States v. Brown,* 16 M.J. 36 (C.M.A.1983), compel, or even persuasively argue for, the proposition advanced by appellant. Both *Shelwood* and *Brown* involved service record entries which we shall denominate, and hereafter refer to as, "purely administrative" in nature.[5] By this we mean that such entries, made or maintained solely to evidence the nature of the recorded administrative action taken or immediately contemplated, have no ancillary use. In contradistinction, what we shall term as "dual purpose administrative" entries, which record the results of prior disciplinary or judicial proceedings or which evidence the administrative recordation of periods of alleged unauthorized absence, serve a multitude of administrative functions—ancillary uses—*that obtain significance apart from the act of recordation of an event or action.*[6] An understanding and appreciation of the differences which procedurally distinguish these two types of administrative entries is vital to the resolution of the issue under consideration.

That the rights to due process attendant to a purely administrative entry are significantly distinct from those afforded either prior or subsequent to the preparation of a dual purpose administrative entry is a proposition which admits of no disagreement.

The right to contradict or challenge the substance or verity of a purely administrative entry, if such be afforded by statute or regulation, must of necessity arise as an incident of the entry itself. By the same token, any loss of right, privilege or property which issues from such an entry occurs as an incident of that entry alone. We observe that it is the absence of an ancillary use, which is always coupled with, or is preceded by, a proceeding sounding in due process, which thus delimits the right of challenge and results in any loss being contemporaneous with the making of the entry. The right to contest and challenge a purely administrative entry is, of course, afforded only by the notice-and-comment provision embodied within Article 1110. To falter, therefore, from providing the remedy offered by that regulation renders nugatory the right granted, for it silences forever any opportunity to challenge or comment upon the substance of the entry.

In contrast, each dual purpose administrative entry described above is coupled with a hearing which is independent of the entry itself. The opportunity to challenge or contest arises as an incident of the hearing which precedes or antedates the entry—not of the entry. For example, for a record allegation of unauthorized absence to obtain legal, as distinct from administrative, significance, it must be tested at a proceeding subsequent to the making of the entry—be it an Article 15, UCMJ, 10 U.S.C. § 815, hearing or a court-martial. Until so tested, it remains, in a legal sense, but an inchoate entry. In the same vein, before an entry recording the results of nonjudicial punishment or a court-martial conviction can be placed within a service record, it must, perforce, be preceded by an adjudica-

---

5. The entries in *Shelwood* noted instances of prior counselling of that accused concerning his conduct, performance, appearance and dependability. That in *Brown* reflected a notation of "dropped for cheating" from a naval service school.

6. Among such functions we note the following: administrative determinations regarding excusal or nonexcusal of absences, computation of lost time and adjustments to obligated service due to absence or service of adjudged confinement, adjustments of pay due to forfeitures or rate reduction adjudged by a proper forum, recordation of rate reduction for purposes of pay entitlement and determination of seniority, recordation of prior service for use at a subsequent disciplinary or judicial proceeding as matters in aggravation or escalation of the punishment.

tive hearing, the disposition of which is the purported subject of the record entry. In every instance, no termination of a right, privilege, or benefit, and no deprivation of liberty or property can be ordered or directed until the appropriate type hearing is completed, for it is the act of adjudication and disposition via the hearing procedure—not the act of recording the event as a service record entry—which triggers the loss of those varied interests protected by the concept of due process. Thus, for dual purpose administrative entries of the nature cited, we look for the safeguards promoted by due process at the hearing stage, rather than at the recordation stage. Surely an individual should have no legitimate cause to complain where the rights to which he is entitled by due process of law are accorded *in advance* of an adjudicated deprivation rather than virtually coincident with or subsequent to the deprivation occasioned.

 Due process as a concept of law consists of the elements of notice and an opportunity to be heard. The notice element is virtually self-defined. What constitutes "opportunity to be heard" depends in large measure upon the quantity and degree of the deprivation that ensues, or is expected to ensue, from an official act. Though the notice-and-comment remedy afforded by Article 1110 is, by the very nature of the type of entry intended to be regulated, perhaps the most informal procedure legally acceptable under the concept of due process, we harbor no doubt of its sufficiency (when properly circumscribed in application to only purely administrative entries) in light of the nature of the interests at stake and intended to be protected. *See,* for example, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Due process is chameleonic—it neither requires nor guarantees a particular form of procedure. It merely protects those rights not classified as *de minimis.* Implicit from *Shelwood* is the determination by the Court of Military Appeals that the due process afforded by Article 1110 for purely administrative en-

tries is, in fact, the process due, and, thus, is adequate to protect and safeguard the limited nature of the interest then in issue *if advantage be afforded to* and taken of it by the person affected. Explicit from that decision is the recognition that the Court was, and is, unwilling to extend those presumptions normally deemed by law to be incidents of official acts to entries and acts which are the product of such rudimentary procedures.

> "As the prosecution was the proponent of the evidence, it was incumbent upon them affirmatively to demonstrate admissibility. In view of the minimal due process safeguards attending the creation of these 'administrative' entries, we decline to entertain a presumption of regularity."

*Shelwood, supra,* fn. 2, at 224.

 We believe we are on firm ground in stating that, as to purely administrative entries, the burden under Article 1110 is placed upon—for certain, in practice it falls upon—the service member to disprove the substance contained within the entry or to dissuade the official empowered to act from acting. This burden of persuasion is heavy, for under the Article 1110 concept of limited due process, the entry, together with a member's written rebuttal, constitute the entire history of the issue. There is no arbiter of the contest. There is no appeal by right to higher impartial authority.

 With respect to the dual purpose administrative entries, the presumption of regularity has consistently attached to properly executed service record entries which record an allegation of unauthorized absence, and which reflect the imposition of nonjudicial punishment and convictions by court-martial. *See United States v. Masusock,* 1 U.S.C.M.A. 32, 1 C.M.R. 32 (1951); *United States v. Moore,* 8 U.S.C.M.A. 116, 23 CMR 340 (1957); *United States v. Crissinger,* 30 C.M.R. 662 (N.B.R.1960). Incident to the admissibility of a service record entry which reflects the prior imposition of nonjudicial punishment is the presumption of regularity that the rights delineated within Article 15, UCMJ, Paragraph 133*b*,

MCM, and 0101, JAGMAN were accorded prior to the adjudication recorded. A properly executed service record entry evidencing conviction by court-martial carries with it the presumption of regularity that the trial was conducted in accordance with, and thus that the individual tried received the rights accorded by, the Constitution, the UCMJ, MCM, controlling service regulations, and pertinent decisional law.

This distinction in the application of the rule of presumptions is strong evidence, standing alone, that the dual purpose administrative entries under consideration do not come within the contemplated reach of Article 1110. We need not, however, restrict our comparative inquiry to this singular analysis.

■ As aforementioned, the due process rights granted by Article 1110 are, though sufficient for the purposes intended, most rudimentary. With this much agreed, we would pose the following question to appellant: Would he be willing to have his guilt or innocence determined at either an Article 15, UCMJ, proceeding or any of the court-martial forums if the only right possessed to challenge the jurisdiction of the forum, or to contest the procedures by which his case was convened, referred and tried, or to object to the manner in which evidence is received and admitted, or to deny the allegations was to be notified of the charge and to submit a written argument in his defense? The answer is as clear as the question is rhetorical. By considering due process to be a concept which varies and expands within the spectrum of granted rights in direct relationship to the nature of the interest at stake, rather than a symbolic gesture—full of sound and fury, signifying nothing—we gain a perspective essential to the resolution of appellant's complaint. At one end of the yardstick which measures due process is the Article 1110 written-argument "hearing." At the other end is the criminal trial, which affords the formal and protective rights granted by a true adversary trial-type hearing—notice of the allegations; the right to counsel; the right to have the court convened and conducted in accordance with the Constitution, Congressionally enacted law, and Presidential regulations; the right to assert, without burden of proof, a multitude of defenses recognized in the law; the right to have the case decided upon recognized rules of evidence and procedures; the right to confront and cross-examine witnesses; the right to lose no advantage, and suffer no disadvantage, by remaining silent; and the right to present a case in rebuttal, which includes the right to call witnesses and to personally present a defense to the decision maker. Three constitutional concepts of due process also apply to every trial by court-martial: the presumption of innocence, the requirement that proof of guilt be established beyond reasonable doubt, and the requirement that the Government bear the burden of proving guilt by that standard. This is in marked distinction to the due process standards under Article 1110.

Furthermore, the appellate review system for appeal from a conviction by court-martial is the most expansive and generous known in modern law.[7] A comparison of these appeal rights with the absence of any opportunity for impartial review of either the entry, or the comment offered in rebuttal, as governed by Article 1110, invites the conclusion that dual purpose administrative entries which record the results of a court-martial conviction are adequately encumbered by the strictures of due process which attach to the very trial proceedings which are their genesis. No legally cognizable interest of an accused would be promoted by engrafting the Article 1110 due process requirement upon an entry as to which due process has already been afforded and is complete. Any interest which survives the trial proceedings which generated the entry is indeed *de minimis.* Due process, therefore, does not apply. The above recited distinctions, without resort to other argu-

---

7. In addition to the automatic review procedures, we also refer to the independent rights conferred by Article 38(c), UCMJ, 10 U.S.C. § 838(c), and by the decision in *United States v. Goode,* 1 M.J. 3 (C.M.A.1975).

ment, offer sufficient predicate for concluding that compliance with Article 1110 is not a requisite to admissibility of a service record entry which records a prior conviction by court-martial—the "plain meaning" of the term "adverse matter" notwithstanding.

While the due process rights attendant to an Article 15, UCMJ, hearing are lesser in degree and scope than those incident to trial by court-martial, they are substantially greater than the notice-and-comment right of Article 1110. A nonjudicial punishment proceeding is a quasi-trial type hearing. Beyond the due process foundational rights set forth in the UCMJ, MCM, and JAGMAN which govern how the proceedings will be conducted, is the right, subject to no qualification excepting the individual's election, to appeal the findings entered and punishment imposed as being unjust and disproportionate, respectively. Further, the burden of meeting the standard of proof at an Article 15, UCMJ, hearing—preponderance of the evidence—is carried by the Government and is far more protective of a member's rights than the unarticulated burden carried by that member when challenging a service record entry under Article 1110 procedures.[8] What is now evident is that those reasons advanced above which argue against application of Article 1110 to records of court-martial convictions apply with equal force and logic to entries recording imposition of nonjudicial punishment.

It is clear beyond cavil that the Court in *Shelwood* and *Brown* was disturbed that an adverse administrative entry could be placed in a member's service record without his knowledge. Failure to follow the Article 1110 due process procedures governing notice inexorably produces this result for a purely administrative entry. Not so, however, with a dual purpose administrative entry, for were Article 1110 to not exist, the member would lose no right now granted

by that article—including notice. The requirement of personal presence of an accused at all disciplinary and judicial proceedings, with its attendant notice of the nature of the allegations as well as of the matters intended for use as proof of same—such as a report of unauthorized absence—renders incredulous any suggestion that a failure to apply Article 1110 to the dual purpose administrative entries under discussion results in a deprivation of the right to notice—or of any right. Further, we note that in *United States v. Owens*, 11 U.S.C. M.A. 240, 29 C.M.R. 56 (1960), the Court took judicial notice of the fact that an accused knows that the results of the imposition of nonjudicial punishment will be made a part of his official service record. Surely the same notice can be taken with regard to records evidencing conviction by courts-martial.

The rule of finality lends further support for rejecting the assertion that Article 1110 applies to dual purpose administrative entries. A purely administrative entry, as to which Article 1110 definitely applies, can never become final, by definition, until the opportunity to submit written rebuttal to the substance of the entry is afforded the service member affected. Quite the contrary is the case with dual purpose administrative entries. An Article 15, UCMJ, proceeding does not become final until either the "reasonable time" has passed without submission of an appeal or, where submitted, a decision by the officer exercising general court-martial jurisdiction has been entered on the merit of the appeal. A conviction by summary court-martial or special court-martial sitting without a military judge does not become final until the review contemplated by Article 65(c), UCMJ, or Article 66, 10 U.S.C. §§ 865(c), 866, if applicable, has been completed. The finality of convictions by all other court-martial forums is determined by reference

---

8. We can extend the comparison further. The decision in *United States v. Booker*, 5 M.J. 238 (C.M.A.1977) is in reality a judicially created remedy to ensure that a major due process right which attaches to a nonjudicial punishment or summary court-martial—the right of refusal—is in fact accorded and can, on the basis of a service record entry which evidences such compliance, be confidently received into evidence with a presumption of regularity attaching.

to the use intended. For purposes of impeachment or when offered as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, they are final when the sentence of the court is adjudged. Mil.R. Evid. 404*b* and 609*e*. If offered as evidence in aggravation during the sentencing stage of the trial, they are final only when all direct review and appeals are completed. Paragraph 75*b*(3)(b), MCM. These procedural rules of finality would be wholly disrupted—and, in essence, rendered nugatory—if the admissibility determination was saddled with compliance with Article 1110 as yet another requisite to finality. We do not believe such an absurd result was ever intended, or can logically be supported.

Careful scrutiny of *Shelwood* indicates that the Court, in determining the full protective scope of Article 1110, initially had to consider and then accept or reject, *in toto* or in part, the opinion of the Judge Advocate General. It is not essential that we deal at length with that opinion. What is clear is that the Court specifically rejected the "fact/opinion" distinction advanced as to what constitutes "adverse matter" within the meaning of Article 1110 *where the affected entry was intended for use as adverse evidence in a court-martial.*

> "Whatever may be the validity of the Acting Judge Advocate General's views with respect to administrative processing of personnel records, we do not accept this fact/opinion interpretation of 'adverse matter' *for purpose of admissibility of evidence in criminal trials.*" (Emphasis supplied).

*Shelwood, supra,* at 225–226.

We distill from this quoted language more than a rejection of a rather vacuous "fact/opinion" interpretation. The Court is read as emphasizing two distinct and recognized principles of criminal procedure which become intertwined within the setting of *Shelwood:* (1) avoidance of litigation of collateral issues, and (2) ensuring that an administrative regulation, or its interpretation, does not result in the unilateral surrender, by the side *creating* the harm, of

the due process standards which surround a criminal trial.

The Court obviously recognized that, be an entry styled fact or opinion, the prejudice resulting is without distinction. The motivation to take issue with the substance of an adverse entry, and the potential for detriment to career development which arises from that entry, is not altered by the categorization as "fact" or "opinion"—neither should the right to do so. To permit the rejected distinction to survive would invite the interjection into a criminal trial of litigation of the collateral issue of whether the entry is "fact" or "opinion." The substantive basis supporting the entry would, therefore, need be addressed. A criminal proceeding is no place to re-try or to appeal the substance of any prior and completed administrative action, such as whether the individual did in fact cheat on an examination, or was in fact counselled, or did in fact commit the offense for which he received nonjudicial punishment or a prior court-martial. Where, however, no distinction is permitted to be made between what is fact and what is opinion, the trial court need only determine whether the due process rights applicable to the interest involved, and reported upon by the entry, were properly accorded—always a legitimate subject of inquiry incident to the admissibility determination. On this limited issue, a trial court may, upon receipt of a properly executed entry recording a prior Article 15, UCMJ, or trial by court-martial, presume the regularity of the underlying proceedings and, thus, that the due process rights which attach at such forums were accorded. As to a purely administrative entry, the evidence of compliance with the due process standards of Article 1110 must be patent on the face of the entry itself. Only then will a presumption of regularity attach.

It is a cardinal principle of law that no evidence adverse to an accused is admissible against him in a criminal trial without some measure of due process *having already attached to it*—be it compliance with Article 1110 as to purely administrative en-

tries or with the UCMJ, MCM, and, where applicable, the JAGMAN, as to dual purpose administrative entries which report prior disciplinary or judicial adjudications, —or *being afforded at the trial proceeding itself* as a condition upon which its admissibility rests—the right to challenge by examination, cross-examination, objection, or rebuttal the substance of the averment within the entry and the procedures incident to its preparation. Records reporting allegations of unauthorized absence fall in this latter category. If the "fact/opinion" distinction were permitted to prevail, an adverse service entry recording a fact would assumably be admissible against a member at a criminal trial without any opportunity to comment or challenge. To adopt the distinction which promotes this result affects more than just the admissibility of a service record entry. It impacts upon the entire court-martial process by countenancing the denigration of the standards of due process which surround a criminal trial. For this reason the "fact/opinion" interpretation was rejected by the Court in *Shelwood*.

While the Court in *Shelwood* and *Brown* was not directly concerned with determining the fullest reach of Article 1110, its decisions leave no room to doubt that records of nonjudicial punishment do not come within the purview of that regulation and the procedural rights to due process granted therein. In both cases, the Court, after concluding that the "purely administrative" entries in issue were erroneously received into evidence at trial, proceeded to determine the impact of the resultant error. In testing for prejudice and concluding that none was suffered by the respective appellants from the failure of compliance with Article 1110, the Court specifically considered the nature of the offenses involved, the punishment adjudged, and the "sentencing factors properly of record"—*admissible records of nonjudicial punishment.*

Clearly the Court, after having addressed as a matter for primary resolution in each case the interpretative reach of the term "adverse matter" as employed in Article 1110 and finding it to be violated where

purely administrative entries, be they denominated "fact" or "opinion," were involved, would not condone, and in fact perpetuate, the continued violation of the same regulation but in a different form. We are compelled to conclude that the Court determined that records of nonjudicial punishment were not within the scope of Article 1110. Only by so concluding could the Court's reference to such records in applying its test for prejudice be explained. Every court must independently judge the admissibility of evidence of record which will be relevant to any issue necessary for resolution—such as that of prejudice in *Shelwood* and *Brown*. Surely if those records of nonjudicial punishment obtained legal significance and independent admissibility for the limited purpose of testing for prejudice, there remains no room to doubt their admissibility for the purpose for which they were offered at trial without compliance with Article 1110—evidence of aggravation admitted pursuant to Paragraph 75*b*, MCM.

Logic compels the conclusion that if the Court found records of nonjudicial punishment admissible under Paragraph 75*b*(2), MCM, without the burden of compliance with Article 1110 attaching as a condition to admissibility, so too would the Court find, for even more compelling reasons, that dual purpose entries reflecting prior convictions by court-martial offered pursuant to, and conditioned upon compliance with, Paragraph 75*b*(3), MCM, or Mil.R.Evid. 404(b), 609, and 803(6), (8), and (24), are admissible without evidence of such compliance. Furthermore, we do hesitate to "cut the Gordian knot" that would restrain the application of the same rationale to service record entries which record allegations of unauthorized absence. Remembering that it is the confidence that due process has already obtained as to the substance of an entry recording a court-martial conviction or the imposition of nonjudicial punishment which makes such entries admissible independent of Article 1110, it would be incredulous to suggest that, as to an entry such as a NAVPERS 1070/606 or appropriate "Page 13", an individual is not only entitled

to contest its substantive content and procedural infirmities as a condition to admissibility in a trial or quasi-trial type adversary proceeding, but also possesses the right to litigate by submission of written argument the same issues in advance of that proceeding. Article 1110 is not the mysterious arcanum of relief which appellant claims it to be.

We find that neither *Shelwood* nor *Brown* supports the contention pressed by appellant. We thus hold that service record entries recording imposition of nonjudicial punishment, conviction by court-martial, or allegations of unauthorized absence for a period embraced within the charges referred to the court in which the accused is then being tried, do not come within the provisions of Article 1110. As such, their admissibility in that court is not conditioned upon compliance with Article 1110.

The same rationale which we have applied in concluding that the denoted dual purpose administrative entries, though adverse, are not "adverse matter" within the meaning of Article 1110, would also apply even if we were to conclude the contrary. We reach this resolution of the issue on two grounds. First, at the stage that the dual purpose entries are offered for use in a criminal trial, those rights to due process attendant to the action reported upon by the entry will either have already been accorded or, as is the case with an entry recording an allegation of unauthorized absence, will be accorded as an element of determining their admissibility. The law does not require the proverbial "second bite at the apple." Second, accepting this logic, if compliance with Article 1110 is the process desired, surely affording the expanded rights incident to an Article 15, UCMJ, hearing or a trial by court-martial is more than sufficient to comply with the concept of due process embodied within Article 1110.

We thus reject appellant's assertion of error based upon Article 1110. Finding the inquiry of the military judge during the providence inquiry to have completely explored the issue of appellant's intoxication

at the time of the offense of attempted robbery, we reject the second assigned error without further comment.

Accordingly, the findings and sentence as approved on review below are affirmed.

Senior Judge ABERNATHY and Judge MITCHELL concur.